UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ICOS VISION SYSTEMS CORPORATION N.V. and ICOS VISIONS SYSTEMS INC., | Case No. 1:10-cv-00604 (PAC) |
| Plaintiffs and Counterdefendants, | **MEMORANDUM OF LAW IN SUPPORT OF ICOS'S MOTION FOR SUMMARY JUDGMENT BASED ON IMPLIED LICENSE BY LEGAL ESTOPPEL AND PROSECUTION LACHES** |
| -against- | |
| SCANNER TECHNOLOGIES CORPORATION, | |
| Defendant and Counterclaimant. | |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................ 1

    A. Implied License ......................................................................... 1

    B. Prosecution Laches .................................................................... 3

II. BACKGROUND REGARDING THE '237 PATENT FAMILY ................... 4

    A. Ball Grid Array Inspection Devices And The '237 Patent-In-Suit ........ 4

    B. Scanner Provides The Covenant Not To Sue In An Attempt To Deprive This Court Of Jurisdiction And Reopen The Case In The Eastern District Of Texas ................................................................................ 6

    C. Scanner's Motion To Dismiss For Lack Of Declaratory Judgment Jurisdiction ............................................................................... 8

    D. At the Eleventh Hour, Scanner Purports To Revoke The Covenants Not To Sue ...................................................................................... 9

    E. Scanner Delayed Prosecution of Patents in the '237 Patent Family to Draft Claims Covering New Developments in the Industry. ................... 9

III. SUMMARY JUDGMENT STANDARD ................................................ 13

IV. ARGUMENT ................................................................................. 13

    A. The '237 Patent Is Unenforceable On The Basis Of Implied License ........ 13

        1. A Patent Holder's Action To Derogate From The Scope Of Granted Rights Is Barred By An Implied License By Legal Estoppel ........................................................................... 13

        2. The Covenants Not To Sue Are Irrevocable ............................. 15

            a. A Covenant Not To Sue Constitutes A Perpetual Promise To Forbear From Suit ............................................... 15

            b. Federal Circuit Case Law Establishes That Covenants Not To Sue Are Irrevocable Once Given .......................... 16

        3. Any Consideration Requirement For An Implied License Is Satisfied By The Doctrine Of Promissory Estoppel ................... 18

            a. The Covenants Not To Sue Are Clear And Unambiguous. ......... 19

            b. ICOS Reasonably And Foreseeably Relied On The Covenants Not To Sue and Was Injured As A Result Of The Reliance. ....................................................... 19

        4. The Eight Covenanted Patents Entitle ICOS To An Implied License To Practice The '237 Patent .................................... 20

            a. ICOS Is Entitled to An Implied License To The '237 Patent Based On Claim 79 of the '411 and '678 Patents .............. 22

## TABLE OF CONTENTS
(Continued)

Page

b.  ICOS Is Entitled to An Implied License To The '237 Patent Based On The Covenanted Patents In Combination .................... 25

B.  The '237 Patent Is Unenforceable On The Basis Of Prosecution Laches .......... 26

1.  Legal Standard for Prosecution Laches .................................................. 26

2.  Prosecution Laches Bars Enforcement of Scanner's '237 Patent ............ 27

a.  The Four Patent Applications In The '237 Patent Chain Span 12 Years ............................................................................ 28

b.  Scanner Delayed Prosecution Of The '237 Patent To Add Claims Covering Products Developed By ICOS And Other Scanner Competitors During Prosecution .................................... 29

(1)  Scanner Began Its Pattern of Prosecution Delay In 1999 ...................................................................................... 29

(2)  Scanner Continued Its Pattern of Abusive Prosecution Delay In 2007 ................................................ 32

(3)  ICOS And The Semiconductor Industry Were Prejudiced By Scanner's Abusive Delays ....................... 34

V.  CONCLUSION .................................................................................................... 35

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A & E Products Group, L.P. v. Mainetti USA Inc.,*
    70 U.S.P.Q. 2d 1080 (S.D.N.Y. 2004)................................................................26

*AMP, Inc. v. U.S.,*
    389 F.2d 448 (Ct. Claims 1968)...............................................................................14

*Amana Refrigeration, Inc. v. Quadlux, Inc.,*
    172 F.3d 852 (Fed. Cir. 1999)..................................................................................16

*AstraZeneca AB v. Dr. Reddy's Labs., Ltd.,*
    603 F. Supp. 2d 596 (S.D.N.Y. 2009)....................................................................13

*Becton Dickinson & Co. v. C.R. Bard, Inc.,*
    922 F.2d 792 (Fed. Cir. 1990)..................................................................................13

*In re Bogese II,*
    303 F.3d 1362 (Fed. Cir. 2002)................................................................................26

*Cancer Research Tech. Ltd. v. Barr Labs., Inc.,*
    625 F.3d 724 (Fed. Cir. 2010)............................................................................26, 27

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).................................................................................................13

*Chiron Corp. v. Genentech, Inc.,*
    268 F. Supp. 2d 1139 (E.D. Cal. 2002)..................................................................26

*Crossbow Technology, Inc. v. YH Technology,*
    531 F. Supp. 2d 1117 (N.D. Cal. 2007) .................................................................16

*Cummins-Allison Corp. v. Glory Ltd.,*
    WL 355470 (N.D. Ill. Feb. 12, 2003) ....................................................................26

*De Forest Radio Telephone & Telegraph Co. v. U.S.,*
    273 U.S. 236 (1927).....................................................................................13, 14, 18

*Gen-Probe Inc., v. Vysis, Inc.,*
    2002 U.S. Dist. LEXIS 25020 (S.D. Cal. August 5, 2002)....................................26

*Harris Corp. v. Federal Express Corp.,*
    670 F. Supp. 2d 1306 (M.D. Fla. 2006) .................................................................16

# TABLE OF AUTHORITIES
## (Continued)

**Page**

ICOS Vision Sys. Corp., N.V. v. Scanner Tech. Corp.,
  699 F. Supp. 2d 664 (S.D.N.Y. 2010)...................................................................2

Kaye v. Grossman,
  202 F.3d 611 (2d Cir. 2000)........................................................................19

Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.,
  247 F.3d 44 (3d Cir. 2001))........................................................................15

Pratt & Whitney Co. v. United States,
  345 F.2d 838 (Ct. Cl. 1965) ....................................................................27, 35

Reiffin v. Microsoft Corp.,
  270 F. Supp. 2d 1132 (N.D. Cal. 2003) .......................................................26

Schmidt v. McKay,
  555 F.2d 30 (2d Cir. 1977).....................................................................18, 19

Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer
    Maschinenfabrik Aktiengesellschaft,
  829 F.2d 1075 (Fed. Cir. 1987).................................................................14, 18

Super Sack Mfg. Corp. v. Chase Pkg. Corp.,
  57 F.3d 1054 (Fed. Cir. 1995)..................................................................16, 17

Symbol Techs., Inc. v. Lemelson Med.,
  277 F.3d 1361 (Fed. Cir. 2002)................................................................26, 27

Symbol Techs., Inc. v. Lemelson Med.,
  422 F.3d 1378 (Fed. Cir. 2005)......................................................................26

Syverson v. IBM Corp.,
  472 F.3d 1072 (9th Cir. 2007) ......................................................................15

TransCore, LP v. Electronic Transaction Consultants Corp.,
  563 F.3d 1271 (Fed. Cir. 2009).........................................................3, 14, 22, 25

Wang Labs., Inc. v. Mitsubishi Elecs Am., Inc.,
  103 F.3d 1571 (Fed. Cir. 1997)............................................................13, 14, 18

### STATE CASES

Alleghany College v. National Chautaqua County Bank,
  246 N.Y. 369 (1927) ....................................................................................18

## TABLE OF AUTHORITIES
(Continued)

**Page**

*Colton v. N.Y. Hospital,*
414 N.Y.S.2d 866 (1979) ........................................................................................15

*In re Katz Interactive Call Processing Patent Litig.,*
2010 WL 1838641 (C.D. Cal. May 5, 2010) ........................................................26

### DOCKETED CASES

*ICOS v. Scanner,*
Case No. 08-08142 (Docket No. 24) ...............................................................8, 17

*ICOS v. Scanner,*
Case No. 08-08142 (Docket No. 39) .....................................................................8

### STATUTES

28 U.S.C. § 2201 .............................................................................................................8

Fed. R. Civ. P. 56(c) .....................................................................................................13

### MISCELLANEOUS

*Mark A. Lemley & Kimberly A. Moore, Ending Abuse of Patent Continuations,* B.U. L.
Rev. 84:63-118 (2004) ..........................................................................................31

Defendant and Counterclaimant Scanner Technologies Corporation ("Scanner") has accused Plaintiffs and Counterdefendants ICOS Vision Systems Corporation N.V. and ICOS Visions Systems Inc. (collectively, "ICOS") of infringement of U.S. Patent No. 7,653,237 (the "'237 patent").[1]  For the reasons set forth below, ICOS respectfully moves for summary judgment that Scanner's '237 patent is unenforceable against ICOS on each of two independent bases:  ICOS's affirmative defense of implied license by legal estoppel and ICOS's affirmative defense of prosecution laches.  Granting this motion with respect to prosecution laches will dispose of all infringement claims in this action.  Granting this motion with respect to implied license by legal estoppel will dispose of all infringement claims based on products developed as of the date of the covenant not to sue.[2]

## I.   **INTRODUCTION**

The undisputed facts in this case establish that Scanner engaged in egregious gamesmanship with regard to the '237 patent, both in Federal Court and before the United States Patent and Trademark Office ("PTO") and in prejudice to the rights of ICOS.  By this motion, ICOS asks the Court to invoke its equitable powers to remediate Scanner's abuse of the Federal Courts as well as the PTO by ruling that Scanner's '237 patent is unenforceable against ICOS.

### A.   **Implied License**

Scanner attempted to misuse the Federal Court system (i) by issuing to ICOS a covenant not to sue that it hoped would divest this Court of declaratory judgment jurisdiction over this action and (ii) just as discovery addressed to the issues of implied license and prosecution laches

---

[1] For the Court's convenience, a true and correct copy of the '237 patent is attached as Exhibit A to the March 11, 2011 Declaration of Paul R. Gupta in support of the instant motion ("Gupta Decl.").

[2] ICOS maintain other defenses in this action.  As for the other related cases presently stayed by the Court's adoption of the parties' Fourth Amended Joint Consolidation Plan And Bifurcation Order, Civil Case Management Plan And Scheduling Order, the parties shall revisit the status of those cases once the Court has ruled on the instant motions.

was concluding, by claiming it was revoking the very covenant not to sue that Scanner had issued to ICOS.

In March of 2009, Scanner provided ICOS with a covenant not to sue covering eight patents in an attempt to divest this Court of declaratory judgment jurisdiction and enable Scanner to file a new action in Texas.  At the time, these eight patents constituted Scanner's entire portfolio of ball grid array inspection patents, though three other applications were still being prosecuted which Scanner intended to assert against ICOS in other jurisdictions once the patents issued.  Scanner's attempt to use the covenant not to sue to divest this Court of jurisdiction over this and related declaratory judgment actions failed when Judge Chin later ruled that it retained jurisdiction to issue declaratory judgment on the non-covenanted patents, including the '237 Patent.  *ICOS Vision Sys. Corp., N.V. v. Scanner Tech. Corp.*, 699 F. Supp. 2d 664 (S.D.N.Y. 2010).

Having failed in its attempt to divest this Court of jurisdiction with its covenant, Scanner now seeks to withdraw the covenant.  One day before discovery was scheduled to close, Scanner represented to ICOS – out of the blue – that it was revoking the covenant not to sue.  By law, however, the covenant cannot be revoked, and Scanner's attempt to do so is therefore inoperative.  Scanner has also asserted that ICOS is not entitled to the covenant's full legal effect because, when provided, the covenant lacked supporting consideration.  This is incorrect; no such consideration is required.  But even if such consideration were required, Scanner is estopped from asserting that the covenants are not supported by consideration under the doctrine of promissory estoppel.

The eight patents covered by the covenant not to sue include a total of 615 claims, which disclose every characteristic of the '237 patent.  Scanner's assertion of the '237 patent, then,

would derogate ICOS's rights under the covenant not to sue.  Scanner may not give with one hand and take away with the other hand.  Under well-established Federal Circuit law, ICOS is fully entitled to practice the '237 patent under the doctrine of implied license by legal estoppel. *See, e.g., TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009).

### B.    Prosecution Laches

Scanner also attempted to misuse the patent prosecution system.  Scanner engaged in a series of maneuvers designed to delay the prosecution of patents in the '237 patent family on multiple occasions over a twelve-year period.  As shown in this memorandum, Scanner played fast and loose with the PTO in an attempt to expand the scope of its claims to cover products not invented by Scanner but, rather, developed by ICOS and others in the semiconductor industry long after the initial application that led to the issuance of the '237 patent had been filed.  In doing so, Scanner prejudiced the rights of ICOS, which of necessity continued to develop products while Scanner improperly continued to delay prosecution of the '237 patent chain for years on end.

The equitable doctrine of prosecution laches has specifically been elaborated by the courts to protect parties like ICOS from abuse of the patent system of the very sort exercised by Scanner in its prosecution of the '237 patent.  Scanner's prosecution of the '237 patent chain is a textbook example of an instance in which prosecution laches applies.

Here, the uncontested facts, including Scanner's own admissions, plainly show a pattern of inexcusable gamesmanship and delay.  ICOS asks that this Court invoke its equitable powers to right these wrongs by ruling that Scanner's '237 patent is unenforceable and dismiss Scanner's patent infringement claims against ICOS with prejudice.

## II.   BACKGROUND REGARDING THE '237 PATENT FAMILY

### A.   Ball Grid Array Inspection Devices And The '237 Patent-In-Suit

In this action, Scanner asserts that ICOS infringes the '237 patent, which relates to the inspection of a particular kind of electronics packaging known as a ball grid array devices.  An integrated circuit, or microchip, is typically very sensitive to the surrounding environment, and specialized packaging is used to support and protect the delicate electronics on the chip.  Declaration of Dr. Larry F. Thompson in Support of ICOS's Motion for Summary Judgment, dated March 11, 2011, ("Thompson Decl.") ¶ 25.  In order to function, the chip must also be connected to power and have a mechanism for distributing signals on and off of the chip.  *Id.*  Electronics packaging generally serves each of these purposes, and a "ball grid array" is a specific method of providing the electrical connection between a microchip and the circuit board on which it is mounted.  *Id.*  A "ball grid array" is an array of solder balls, arranged in a grid, which provide electrical connection between a microchip and a circuit board.  *Id.*  Ball grid arrays must be positioned with extraordinary precision, and a miniscule deviation in the height of one of the balls can render the entire ball grid array package inoperative.  *Id.*

Given this sensitivity to precise alignment, companies such as ICOS have developed machines that inspect ball grid array units to ensure that they meet manufacturing specifications.  The diagram below, taken from the asserted patent, shows an arrangement of an inspection system.  *Id.* ¶ 31.  In an initial calibration step, a "calibration reticle" is attached to the BGA unit with a precise, known pattern (a "planar precision pattern" in the language of the patent).  *Id.* ¶ 34.  Images of the precision pattern are used to calibrate the system, i.e., to filter out sources of uncertainty from the cameras and optics.  *Id.* ¶ 35.  In the diagram below, two cameras take images of the ball grid array (labeled "20" in the diagram below).  *Id.* ¶ 32.  Those images are processed, and information from them is incorporated into calculations that yield the precise

height of each solder ball. *Id.* ¶ 37. When a ball grid array unit meets certain quality specifications, it is cleared. *Id.* ¶ 38. When it does not, it is discarded or repaired. *Id.* ¶ 39.



Figure 1A – '237 patent

At one time, Scanner and ICOS used to be competitors in the marketplace for equipment used to inspect ball grid array devices. During the twelve years while the '237 patent chain was in prosecution before the PTO, ICOS continued to develop ball grid array inspection device technology. Declaration of Carolus van Gils in Support of ICOS's Motion for Summary Judgment, dated March 11, 2011, ("van Gils Decl.") ¶¶ 2-16. NVIDIA Corporation ("NVIDIA"), which is involved in cases that are related to this action and that have been stayed, has used ICOS inspect its semiconductor devices. Declaration of Clifford Christian Wiles in Support of ICOS's Motion for Summary Judgment, dated March 11, 2011, ("Wiles Decl.") ¶ 7.

**B.**   **Scanner Provides The Covenant Not To Sue In An Attempt To Deprive This Court Of Jurisdiction And Reopen The Case In The Eastern District Of Texas**

On March 11, 2009, Scanner sent ICOS a document entitled "Covenant Not To Sue" which stated that "Scanner Technologies Corporation hereby covenants not to sue ICOS Vision Systems Corporation N.V. or ICOS Vision Systems Inc. for infringement, whether direct or indirect, of any claim of U.S. Patent Nos. 7,079,678, 7,086,411, 6,915,006, 6,915,007, 6,862,365, 6,072,898, 5,574,668, and 5,173,796 based upon methods or products previously or currently made, used, offered for sale, or sold in the United States or imported into the United States by ICOS Vision Systems Corporation N.V. or ICOS Vision Systems Inc. prior to the date of this covenant."  Declaration of Kevin McAndrews in Support of ICOS's Motion for Summary Judgment, dated March 11, 2011, ("McAndrews Decl.") Exh. D.

The covenants not to sue were provided to ICOS and NVIDIA in a bald attempt to defeat the declaratory judgment jurisdiction of this Court and re-venue the case in the Eastern District of Texas. REDACTED





Moreover, Scanner's current counsel, Robert Huntsman, has effectively admitted that the covenants not to sue were provided to defeat jurisdiction. In his e-mail purporting to revoke the covenants not to sue, Huntsman stated, "Since Scanner was unable to defeat ICOS and NVIDIA's claim of jurisdiction, there is no benefit to Scanner to continue the license and thus has revoked them as per the attached revocations." E-mail From Robert Huntsman to Paul Gupta dated January 20, 2011, annexed to the Gupta Decl. as Exh. L.

Scanner assured ICOS that the covenant not to sue would be perpetual and irrevocable. During a conference with the Court on July 30, 2009, Jacqueline Meyer, counsel for Scanner, confirmed "to the Court and to counsel for NVIDIA and ICOS that the products or processes that existed at the time of Scanner's covenants not to sue are immune from suit by Scanner, both now and in the future, and that the covenants not to sue exhaust Scanner's patent rights against any customers of ICOS or NVIDIA for the covenant patents." Gupta Decl. Exh. M. Kurt Niederluecke, also counsel for Scanner, confirmed on July 31, 2009 that "at the request of

counsel for ICOS and NVIDIA, I repeated and confirmed to counsel that the products or processes that existed at the time of the [sic] Scanner's covenants not to sue are immune from suit by Scanner, both now and in the future, and that the covenants not to sue exhaust Scanner's patent rights against any customers of ICOS or NVIDIA for the covenant patents."  Gupta Decl. Exh. N.

### C.   Scanner's Motion To Dismiss For Lack Of Declaratory Judgment Jurisdiction

On August 28, 2009, Scanner moved to dismiss the complaint in Case No. 08-8142 for lack of subject matter jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* In particular, Scanner argued that because the covenants not to sue disposed of all of the patents in suit but one (U.S. Patent No. 7,508,974 (the "'974 patent"), and Scanner had not taken any steps to accuse ICOS of infringement under that patent, ICOS was under no risk of litigation, divesting the Court of jurisdiction to hear the case. *ICOS v. Scanner*, Case No. 08-08142, (Docket No. 24).  The Court, however, disagreed, concluding that the Court had declaratory judgment jurisdiction on the basis of Scanner's history of litigation against ICOS and its representations during negotiations regarding its intention to enforce patents granted in the future. *ICOS v. Scanner*, Case No. 08-08142 (Docket No. 39).

After the Court denied Scanner's motion to dismiss, the parties met and conferred in an effort to narrow the issues in the case.  As a result of these negotiations, the parties jointly filed, and the Court approved, a Joint Consolidation and Bifurcation Order, Civil Case Management Plan and Scheduling Order ("Joint Case Management Order").  Docket No. 21.   In the Joint Case Management Order, the parties agreed, first, to bifurcate the issues of liability and damages. And second, the parties agreed to a shortened and limited period of discovery "tailored to resolving the two summary judgment motions: (1) a motion for summary judgment to resolve

whether ICOS is entitled to enjoy an implied license via legal estoppel to [the '237 patent]; and

(2) a motion for summary judgment to resolve whether holding [sic] the '237 Patent is

unenforceable due to 'prosecution laches.'  *Id.*  ICOS agreed to limit the case in this fashion in an

effort to mitigate the substantial expense of this case which should never have been filed.

> ### D.   At the Eleventh Hour, Scanner Purports To Revoke The Covenants Not To Sue.

On January 20, 2011, counsel for Scanner stated in an e-mail that "Scanner is reserving

all its rights permitted by law on the entire portfolio.  To that effect, Scanner has revoked the

CNS agreements previously executed as per the attached revocations."  Gupta Decl. Exh. L.

Scanner continued, explaining that since it "was unable to defeat ICOS and NVIDIA's claim of

jurisdiction, there is no benefit to Scanner to continue the license and thus has revoked them as

per the attached revocations."  *Id.*  Scanner's purported revocations stated that "The

COVENANT NOT TO SUE identified above is hereby revoked, effective immediately."  Gupta

Decl. Exh. O.  The purported revocations were signed by Paul Crawford on behalf of Scanner

and dated January 19, 2011.  *Id.*

> ### E.   Scanner Delayed Prosecution of Patents in the '237 Patent Family to Draft Claims Covering New Developments in the Industry.

On January 26, 2010, Scanner's '237 patent issued from the fourth application in a chain

of applications that date from a filing with the PTO over twelve years earlier on January 13,

1998.  The '237 patent is the last patent to issue to Scanner in this family of patents related to the

inspection of ball grid array devices.  The first patent application in the family was filed in May

of 1991.  Thus, Scanner kept this family of patents in prosecution before the PTO for nearly 20

years.  Over the course of these two decades, Scanner prolonged the prosecution of the

applications in the family by repeatedly delaying prosecution of certain of the applications and

by filing numerous continuation and continuation-in-part ("CIP") applications.

Figure 1, below, shows the thirteen Scanner patents in the family.  The eight patents covered by the covenant not to sue provided to ICOS and NVIDIA are lightly shaded in the figure; while the five patents that are not covered by covenant are shaded more darkly.  The four patent applications in the chain leading to the '237 patent appear in the lower portion of the figure.



Figure 1

As shown in Figure 1, Scanner had filed three applications in the family by January of 1998.  Scanner's gamesmanship began in 1999, however, when it initiated a strategy of filing divisional, continuation, and continuation-in-part applications off of the 09/908,243 application.  In the years that followed, a total of 11 patents would issue from this one patent application.  The

pattern began in May of 1999, when Scanner filed two divisional applications along with petitions to "make special"[3] both applications on the basis of purported actual infringement by ICOS of the claimed inventions. *See* Transcript of Deposition of David P. Mork ("Mork Tr.") 63:24–64:4, annexed to the Gupta Decl. as Exh. P. Mr. Mork is the sole living named inventor on the '237 patent. Then, just weeks later in July of 1999, Scanner filed a CIP application to cover a single-camera ball grid array inspection system because, on the eve of an industry trade show, Scanner heard a rumor that ICOS was developing such a system. Mork Tr. 67:7-19; 72:21-73:11.

Tellingly, Scanner pursued an entirely different strategy with regard to Application No. 09/351,892, filed in July of 1999. Scanner let Application No. 09/351,892 sit in prosecution for nearly six years before it eventually issued in March of 2005. Scanner sought to delay this application for two tactical reasons. First, Scanner sought to continually amend the claims to avoid prior art disclosed to it during litigation. Mork Tr. 110:16-23. *See also* email from David Mork to Kevin Pontius dated April 13, 2007, marked as Mork 1033, annexed to the Gupta Decl. as Exh. Y. And second, Scanner sought to amend its claims to cover products made by a particular process as a means for reaching products manufactured overseas. Mork. Tr. 82:16-19; 83:2-21. Scanner baldly admits to pursuing both of these strategies. As set forth in the Argument section, *infra*, such activity is improper and the Federal Circuit view this as an abuse of PTO continuation application process.

Scanner used this July 1999 application as the springboard from which many other applications would follow. Application No. 09/351,892 finally issued as a patent in March of 2005, but during these nearly six years of prosecution of this July 1999 application, Scanner filed

---

[3] A petition to "make special" accelerates the prosecution of an application before the PTO.

two continuation-in-part applications from it in April of 2001, including Application No.

09/844,232 from which two further continuation applications were filed in February of 2005.

Scanner also filed a third application off the July 1999 application in February of 2005.

This application, No. 11/069,758 – which would become the third patent in the '237 patent chain

– was, by contrast, filed as a *continuation* application, not as a CIP application.  The significance

of this is that Scanner filed this application as a continuation notwithstanding the fact that

Scanner impermissibly changed significant portions of the patent application in an attempt to

expand the scope of the claims to cover semiconductor devices using ball grid arrays, generally,

rather than simply cover ball grid array inspection devices.  A continuation application may add

subject matter, but a CIP application may not.  When confronted at his deposition with the

evidence that Scanner added subject matter to this CIP application in violation of PTO rules, Mr.

Mork professed ignorance of Scanner's blatant misrepresentation to the PTO.  Mork Tr. 40:2-12;

41:10-19; 43:9-44:13.

In June of 2005, Scanner filed petitions to make special all three of the applications filed

in February of 2005.  With regard to the third application in the '237 patent chain, however,

Scanner continued its pattern of prosecution delay notwithstanding the filing of the petition to

make special.  When Scanner learned in February of 2007 that the PTO had issued a Notice of

Allowance of claims in this third application in the chain, (Appl. No. 11/069,758), Scanner again

delayed prosecution.  Scanner filed yet a fourth application in the chain (Appl. No. 11/735,982)

on April 16, 2007, so that it would be on file prior to the issuance of claims on the third

application.  Then, on the next day, April 17, 2007, Scanner filed a Request for Continued

Examination in which it replaced all prior versions of the claims in the third application.  The

PTO's February, 2007 Notice of Allowance and Scanner's subsequent Request for Continued

Examination were Exhibits 10 and 11, respectively, to the Mork Deposition and are annexed to Gupta Decl. as Exhs. Q & R.  Documents produced by Mr. Mork at his deposition show that Scanner, once again, delayed prosecution in order to draft new claims covering products in development in the industry, in this instance by ICOS's customer NVIDIA and Tessera.  See documents marked Mork 1049, Mork 1050, and Mork 1043, annexed to the Gupta Decl. as Exhs. S, T, and U.

**III.     SUMMARY JUDGMENT STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Federal Circuit has held that summary judgment "is appropriate in a patent case where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed. Cir. 1990); see also *AstraZeneca AB v. Dr. Reddy's Labs., Ltd.*, 603 F. Supp. 2d 596, 602 (S.D.N.Y. 2009).

**IV.     ARGUMENT**

**A.     The '237 Patent Is Unenforceable On The Basis Of Implied License**

**1.     A Patent Holder's Action To Derogate From The Scope Of Granted Rights Is Barred By An Implied License By Legal Estoppel**

When a patentee waives "the statutory right to exclude others from making, using, or selling the patented invention," the accused infringer is entitled to an "implied license." *Wang Labs., Inc. v. Mitsubishi Elecs Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997).  In *De Forest Radio Telephone & Telegraph Co.* v. *U.S.*, 273 U.S. 236 (1927), the Supreme Court described

the principles of an implied license, noting that an implied license can arise when the original

license is "gratuitous," or provided without consideration:

> No formal granting of a license is necessary in order to give it
> effect. Any language used by the owner of the patent or any
> conduct on his part exhibited to another, from which that other
> may properly infer that the owner consents to his use of the patent
> in making or using it, or selling it, upon which the other acts,
> constitutes a license, and a defense to an action for a tort. *Whether
> this constitutes a gratuitous license, or one for a reasonable
> compensation, must, of course, depend upon the circumstances*;
> but the relation between the parties thereafter in respect of any suit
> brought must be held to be contractual, and not an unlawful
> invasion of the rights of the owner.

273 U.S. at 241 (emphasis added).  Since *De Forest*, courts have recognized different varieties of

implied licenses, each reflecting a different rationale.  *See Wang Labs*, 103 F.3d at 1580.  The

doctrine of implied license by legal estoppel, the court wrote in *Wang Labs*, arises in scenarios

"where a patentee has licensed or assigned a right, received consideration, and then sought to

derogate from the right granted."  *Id.* at 1581 (citing *Spindelfabrik Suessen-Schurr, Stahlecker &

Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075 (Fed. Cir.

1987); *AMP, Inc. v. U.S.*, 389 F.2d 448 (Ct. Claims 1968).

In *TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir.

2009), the Federal Circuit revisited and reaffirmed that in specific situations of the sort present in

this action, a covenant not to sue on particular patents can gave rise to an implied license to

patents not explicitly covered by the covenant not to sue.  TransCore had sued a competitor,

Mark IV Industries, for infringement of several TransCore patents but, in a settlement agreement,

TransCore had provided Mark IV with a covenant not to sue on ten patents.  563 F.3d at 1273.

TransCore later sued Electronic Transaction Consultants Corp. ("ETC"), a customer of Mark IV,

for infringement of the patents that were in the suit against Mark IV and one additional patent.

*Id.*  The *TransCore* court ruled that when a patentee has licensed or assigned a right, then seeks

to derogate from that right through the assertion of another patent, the accused infringer is entitled to an implied license by legal estoppel. *Id.* at 1279.

ICOS is equally entitled to an implied license to practice the '237 patent under the covenants not to sue. As set forth in detail below, the '237 patent is necessary to practice patents in the covenant not to sue, and a claim for infringement by Scanner would derogate significantly from the rights granted in the covenant not to sue.

**2.    The Covenants Not To Sue Are Irrevocable**

Scanner's last-ditch attempt to revoke the covenants not to sue is ineffective for two reasons. First, the covenants not to sue are perpetual. And second, the Federal Circuit has repeatedly held that covenants not to sue permanently foreclose future suits.

**a.    A Covenant Not To Sue Constitutes A Perpetual Promise To Forbear From Suit**

Under the law, a covenant not to sue that does not state that it is for a limited time is permanent and perpetual. In *Colton v. N.Y. Hospital*, 414 N.Y.S.2d 866 (1979), the court wrote that a covenant not to sue is executory, that is, "the performance it demands is continuous and prospective either permanently, or for a limited, stated period of time." *Id.* at 873. *See also Syverson v. IBM Corp.*, 472 F.3d 1072, 1084 (9th Cir. 2007) ("A covenant not to sue also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue.") (quoting *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 n.4 (3d Cir. 2001)).

Scanner's covenants not to sue does not include any temporal limitation whatsoever. McAndrews Decl. Exh. D; *See also* Declaration of David Shannon in Support of ICOS's Motion for Summary Judgment, dated March 11, 2011, ("Shannon Decl."), Exh. A.  It is, therefore, perpetual, and Scanner's purported revocation is ineffective.

-15-

      **b.**    **Federal Circuit Case Law Establishes That Covenants Not To Sue Are Irrevocable Once Given**

Federal Circuit case law unambiguously establishes that covenants not to sue last for the life of the patent.  In *Super Sack Mfg. Corp. v. Chase Pkg. Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995) the Federal Circuit concluded that a covenant not to sue similar to the one provided by Scanner "forever estopped" the patentee from asserting liability against the covenanted party. *See also Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855-56 (Fed. Cir. 1999) (holding that a similar covenant "forever estopped [the patentee] from asserting liability . . ."); *Crossbow Technology, Inc. v. YH Technology*, 531 F. Supp. 2d 1117, 1123 (N.D. Cal. 2007) ("the covenant not to sue submitted along with this motion unequivocally establishes that Crossbow will not pursue claims for infringement of the [patent-in-suit]."); *Harris Corp. v. Federal Express Corp.*, 670 F. Supp. 2d 1306 (M.D. Fla. 2006) (holding, based on *Super Sack*, that a covenant not to sue "was sufficient to constitute a binding promise").  By these principles, Scanner is similarly estopped.

In *Super Sack*, as in this case, a declaratory judgment defendant covenanted not to sue for infringement on a set of asserted patents, seeking to eliminate declaratory judgment jurisdiction over the action against it.  *Id.* at 1055.  In its motion to dismiss, Super Sack stated the following through counsel:

> Super Sack has previously offered to dismiss its claims of infringement if Chase would dismiss its Declaratory Judgment Counterclaims. *Super Sack will now go one step further. Super Sack will unconditionally agree not to sue Chase for infringement as to any claim of the patents-in-suit based upon the products currently manufactured and sold by Chase.* This totally removes any current or future apprehension by Chase that it will face claims of infringement regarding the patents-in-suit, and it completely eliminates any actual case or controversy in this case. Without an actual case or controversy, the Court is divested of jurisdiction.

*Id.* (emphasis in *Super Sack*).  The covenant in *Super Sack* was not memorialized in any separate legal document, was provided by counsel alone in moving papers, and was unilateral.  *Id.*  Chase

Packaging argued on appeal that the form of the promise in moving papers "deprives the promise of any power it might otherwise have to moot this case" and that Super Sack might later "deny that its counsel . . . had authority to make the statement that it would not ever sue Chase in the future." *Id.* at 1059. The Federal Circuit disagreed, writing that "Super Sack cannot free itself of the estoppel that its counsel has created with respect to Chase merely by retaining different counsel . . . . Super Sack is bound, *both now and in the future*, by its promise not to sue Chase." *Id.* (emphasis added).

Indeed, counsel for Scanner, Kurt Niederluecke, modeled Scanner's covenant not to sue on the statements made by counsel in Super Sack. Deposition of Kurt Niederluecke, 70:1-16 ("I believe [the covenant] language is very similar to the *Super Sack* opinion and language which is recited specifically in the covenants not to sue."). Moreover, Mr. Niederluecke and co-counsel for Scanner Jacqueline Meyer have repeatedly made statements to ICOS and to the Court reciting the Federal Circuit's language in *Super Sack*. *See* Declaration of Kurt J. Niederluecke In Support Of Defendant's Motion To Dismiss ¶ 5 ("I repeated and confirmed to counsel that the products or processes that existed at the time of the [sic] Scanner's covenants not to sue are immune from suit by Scanner, *both now and in the future* . . .") (emphasis added); Declaration of Jacqueline Meyer In Support Of Defendant's Motion To Dismiss ¶ 2 (confirming to ICOS, NVIDIA, and the Court that the covenants not to sue bar a suit by Scanner "both now and in the future."); Memorandum In Support Of Motion To Dismiss, ICOS v. Scanner, S.D.N.Y. Case No. 08-08142, Docket No. 24, 8 ("Any such processes or products are immune from suit by Scanner, both now and in the future.").

On the basis of the covenants, as well as the representations made by counsel for Scanner to ICOS, NVIDIA, and the Court, Scanner is forever estopped from asserting infringement on

the basis of any covenant included in the covenant not to sue.  Scanner's purported revocation of the covenants, is, therefore, without legal effect.

### 3.   Any Consideration Requirement For An Implied License Is Satisfied By The Doctrine Of Promissory Estoppel

Scanner may attempt to rely on *Wang Labs* and *Spindelfabrik* to argue that an implied license only arises in circumstances where the original license or assignment of rights is supported by consideration.  Such an assertion would, however, be wrong as a matter of law.  As *De Forest* makes clear, the relationship between the parties that gives rise to an implied license sounds in the law of contract.  273 U.S. at 241.  As such, the mention of consideration in *AMP* and *Spindelfabrik* merely serves as an example of a type of license.  There is no basis in law for imposing an additional requirement of consideration on top of a legally binding promise before an implied license can attach.

Further, it is well established that, under the doctrine of promissory estoppel, detrimental reliance constitutes a substitute for consideration.  *See Schmidt v. McKay*, 555 F.2d 30 (2d Cir. 1977) ("a substitute for consideration or an exception to its ordinary requirements can be found in what is styled a "promissory estoppel.") (citing *Alleghany College v. National Chautaqua County Bank*, 246 N.Y. 369 373-74 (1927)).  Although a promise supported by consideration is *one way* for an implied license to arise, nothing in Federal Circuit case law suggests that it is the only way.  Indeed, the Supreme Court made clear in *De Forest* that such consideration is unnecessary.  273 U.S. at 241 ("Whether this constitutes a gratuitous license, or one for a reasonable compensation, must, of course, depend upon the circumstances.").

Even if the Court were to conclude that an implied license by legal estoppel requires an additional element of consideration, "under the doctrine of promissory estoppel a promise without any agreed consideration may be enforced if there has been a substantial change of

position by the promisee in reasonable reliance upon the promise." *Schmidt*, 555 F.2d at 36.  In

New York, "[a] cause of action for promissory estoppel under New York law requires the

plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and

foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."

*Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

**a.**       **The Covenants Not To Sue Are Clear And Unambiguous.**

The covenants not to sue could not be clearer.  They state that "Scanner Technologies

Corporation hereby covenants not to sue ICOS Vision Systems Corporation N.V. or ICOS

Vision Systems Inc. for infringement, whether direct or indirect, of any claim" of the covenanted

patents.  McAndrews Decl. Exh. D; Shannon Decl. Exh. A.  This language unambiguously

communicates Scanner's promise not to sue ICOS for any claim of the named patents.  This

element of promissory estoppel is satisfied.

**b.**       **ICOS Reasonably And Foreseeably Relied On The Covenants
Not To Sue and Was Injured As A Result Of The Reliance.**

ICOS has expended significant resources in reliance on Scanner's covenant not to sue.

Indeed, since the covenant was provided, essentially all litigation-related costs and expenses

incurred by ICOS have been in reliance on the covenants not to sue.  For example, after Scanner

filed its motion to dismiss for lack of subject matter jurisdiction, ICOS dropped the 9th and 18th

claims for relief, which sought declarations of non-infringement and invalidity as to the '974

patent, from its declaratory judgment complaint in this action.  *See* Docket No. 29.  In reliance

on the covenants not to sue, ICOS has also engaged in substantial negotiations with Scanner, and

the parties have agreed to pursue a shortened schedule and limited discovery to resolve two

issues in the case: 1) whether ICOS is entitled to summary judgment based on the affirmative

defense of implied license by legal estoppel; and 2) whether ICOS is entitled to summary

-19-

judgment under the doctrine of prosecution laches.  The first issue, and the instant motion, presume the validity of the covenants not to sue.  ICOS has, therefore, spent approximately two years litigating these cases in explicit reliance on the covenant not to sue.  Before Scanner's purported – and ineffective – withdrawal of the covenant, Scanner never intimated that the covenants themselves were unenforceable in any way.  ICOS has, therefore, reasonably and detrimentally relied on the covenant not to sue.

In addition, ICOS has relied on the covenant not to sue in its business.  McAndrews Decl. ¶ 19.  Since receiving the covenants not to sue from Scanner, ICOS has continued to sell its inspection products in part in reliance on the covenants not to sue.  *Id.*  NVIDIA has similarly relied on the covenant not to sue provided to it by Scanner, as well as the one Scanner provided to ICOS.  Shannon Decl. ¶ 5.  In light of this reliance, any requirement of consideration in support of an implied license is satisfied.

4. <u>The Eight Covenanted Patents Entitle ICOS To An Implied License To Practice The '237 Patent</u>

The patents in Scanner's covenant not to sue have a collective total of 615 claims covering, generally speaking, methods of manufacture of ball grid array inspection devices and the ball grid array inspection devices themselves.  The covenanted patents have issuance dates ranging from December 22, 1992 (for the '796 patent) through August 1, 2006 (the '411 patent).

The asserted patent, the '237 patent, has a total of 35 claims.  And, as Elwin Beaty, one of the inventors directed as the '237 patent was being drafted, claims 1 is the broadest of the '237 patent's claims.  E-mail from Elwin Beaty to Kevin Pontius dated April 09, 2007, Gupta Decl. Exh. S ("Please make sure that Claim one on the old and new applications is the broadest claim."); *see also* Thompson Decl. ¶ 39.

-20-

Under the covenant not to sue, ICOS is entitled to fully practice the 615 claims in the covenanted patents.  No one testifying in this case has identified anything truly new or different in the '237 patent.  David Mork, the remaining living inventor, has identified what he claims are two differences between the '237 patent and Scanner's earlier patents.  *See* Transcript of Deposition of David Mork, 110-113 ("Mork Tr.").  Mork stated first that the '237 patent included a limitation that the "calibration fixture or the calibration pattern [be in] a fixed position."  *Id.* at 110:16-23.  Second, Mork testified that the '237 patent claims two or more cameras while the '798 patent claimed at least one camera.  *Id.* at 111:18-25.

No representative of Scanner in this case has even claimed any distinguishing characteristics other than those identified by David Mork.  In Scanner's responses to ICOS's first set of interrogatories, its only other statement regarding the scope of the '237 patent, Scanner stated first that it "has not formed an opinion as to whether such infringement [of the '237 patent] would not also exist with respect to any of the Related Patents."  Gupta Decl. Exh. X, Response to Interrogatory No. 2.  Scanner then went on to characterize the claims as follows: "Speaking generally, the '237 claims are process claims that are believed to capture product made by the inventive process where as [sic] the claims in the earlier patents tend to be limited to machines and methods that use the inventive process."  *Id.*  Scanner here flatly mischaracterizes its own patent.  Although the '237 patent does include product-by-process claims (claim 21, for example), claims 1 through 20, by contrast, are specifically directed to methods of manufacture. '237 patent, 18:36-21:35.

Moreover, the covenanted patents include all of the features of the claims of the '237 patent, including those identified by David Mork.  Claim 1 of the '898 patent, based on an application filed on January 16, 1998, discloses both features identified by David Mork as being

allegedly "new" in the '237 patent. First, the '898 patent discloses the use of at least two cameras. '898 patent, 18:38-44. And second, as for the use of a "calibration pattern in a fixed position," the preamble of claim 1 of the '898 patent discloses the use of a precision pattern mask deposited on a transparent calibration reticle. '898 patent, 18:30-34. Therefore, the '237 patent is necessary to practice the patents subject to the covenant not to sue, and ICOS is entitled to an implied license by legal estoppel under *TransCore*.

The covenanted patents include a total of 615 claims. For the purposes of illustrating that an infringement action under the '237 patent would impermissibly derogate from ICOS's right to practice the covenanted patents, ICOS analyzes below an exemplary claim of the covenanted patents – claim 79 of the '411 and '678 patents. In particular, the analysis proceeds by considering each step or limitation of the claimed method or process claim 79 and, then, showing that the step or limitation is also claimed in the '237 patent. The direct, one-to-one correspondence between these claims clearly entitles ICOS to an implied license by legal estoppel to practice the '237 patent under Federal Circuit law.

      a.      **ICOS Is Entitled to An Implied License To The '237 Patent Based On Claim 79 of the '411 and '678 Patents**

The '411 and '678 patents are sufficiently similar that they can be analyzed together for the purpose of determining whether they entitle ICOS to an implied license by legal estoppel. Thompson Decl. ¶ 41. Apart from the preamble of their respective claims, the '411 and '678 patents use equivalent claim language. The preamble of nearly every independent claim of the '411 patent reads "A method of manufacturing a ball grid array (BGA) device, the method comprising:". *E.g.,* '411 patent, 20:12-13. The preamble of most independent claims of the '678 patent, on the other hand, claims "A ball grid array (BGA) device produced according to a process comprising:". *E.g.,* '678 patent, 20:7-8. The '411 patent, therefore, corresponds to claim

1 of the '237 patent, which also claims a method of manufacturing a ball grid array device. '237

patent, 18:37-38. The '678 patent, by the same token, corresponds to claim 21 of the '237

patent, which claims the ball grid array device produced according to the claimed process. '237

patent, 22:35-36.

ICOS is entitled to an implied license by legal estoppel based on claim 79 of the '411 and

'678 patents. Claim 79 of the '411 and '678 patents depends from claim 66 of those patents.

The first step of the claimed method of the '411 and '678 patents claims "making a three

dimensional inspection of the lead on the BGA device." '411 patent, 24:51-65; '678 patent,

24:19-20. First, three dimensional inspection refers to the later-specified steps of the method,

which also appear in the '237 patent, as set forth below. '411 patent, 24:51-65; '678 patent,

24:19-20. But *all* of Scanner's patents describe three-dimensional inspections systems, including

the '237 patent. The '237 patent's "Background Information" begins with the statement: "Prior

art three-dimensional inspection systems have involved laser range finding technology, moiré

interferometry, structured light patterns or two cameras." '237 patent, 1:39-41. Furthermore, the

'237 patent's "Detailed Description" states that "[f]rom the precision dots the missing state

values of the system are determined allowing for <u>three dimensional inspection</u> of balls on ball

grid array devices . . ." '237 patent, 6:11-13 (emphasis added). And David Mork, when asked

about development of the UltraVim product before filing the original patent application in

January of 1998, testified as follows regarding his invention with Elwin Beaty:

> Q.   So -- so let me step back again. So at some point when you
> and Mr. Beaty were working on the development of the UltraVim
> product, did you have some kind of ah-ha moment where you
> thought you had made something new and interesting?
>
> A.   Yes.
>
> Q.   Describe what it was that was the ah-ha moment that made
> you feel like you had done something new and interesting?

> A.   We felt that we had a method and apparatus to <u>inspect BGAs</u>
> <u>in three dimensions</u>.

Mork Tr. 28:5-15 (emphasis added).   There can be no doubt that the '237 patent performs a

"three dimensional inspection of a lead on [a] BGA device."

Claim 66 of the '411 and '678 patents next claims "selecting the BGA device as a

produced BGA device based upon the results of the three dimensional inspection."   '411 patent,

24:47-50.   The '237 patent recites the same step.   '237 patent, 18:50-51 ("selecting the ball grid

array device as a manufactured product using the calculated inspection result."); *Id.* at 21:49-50

(same).

Next, claim 66 of the '411 and '678 patent's step of "illuminating the leads" is

necessarily present in the '237 patent because leads must be illuminated in order to be inspected.

'237 patent, 18:39-40; Thompson Decl. ¶ 49.   The '237 patent also includes the steps of the '411

and '678 patents of obtaining two differing views of the lead using fixed optical elements.   '237

patent, 18:43-46; 21:42-45.

Claim 66 of the '411 and '678 patents claims "converting the first and second lead

reference positions into a world value by using parameters determined during a calibration."

'411 patent, 24:63-65; '678 patent, 24:35-37.   The '411 and '678 patents utilize a precision

pattern mask in performing the calibration, as the abstract of the patents make clear.   *See* '411

patent, abstract; '678 patent, abstract ("The precision pattern mask is used for calibration of the

system.").   Both of these characteristics – calibration using a precision mask and utilizing "lead

reference positions" in calculating inspection results – are recited in the claims of the '237

patent.   First, the '237 patent also discloses determining lead reference positions in first and

second views as part of calculating an inspection result.   '237 patent, Figs. 10A, 10B; 15:4-34;

18:47-49; Thompson Decl. ¶ 50, 52.  And second, the '237 patent includes a calibration step using a precision pattern mask.  '237 patent, 18:39-40; 21:38-39.

Claim 79, which depends from claim 66 of the '411 and '678 patents adds the limitation that the two differing views of the lead are obtained "using two sensors."  '411 patent, 25:32-34; '678 patent, 25:3-4.  Furthermore, claim 81 makes clear that each sensor can be a digital camera.  '411 patent, 25:38-41; '678 patent, 25:8-11.  Every claim of the '237 patent also claims two cameras.  *See, e.g.,* '237 patent, 18:39-40; 21:38-39.

Claim 79 of the '411 and '678 patents also bears a close correspondence with the '237 patent, and as a result renders the '237 patent necessary to practice the '411 and '678 patents as ICOS is entitled to by Scanner's covenant not to sue.  Thompson Decl. ¶ 54.  Therefore, ICOS is entitled to an implied license by legal estoppel to the '237 patent under *TransCore*.

**b.     ICOS Is Entitled to An Implied License To The '237 Patent Based On The Covenanted Patents In Combination**

Although the above analysis proceeds by showing that ICOS's right to practice individual claims of the covenanted patents would be significantly derogated by liability for infringement of the '237 patent, such claim-to-claim correspondence is not necessary.  Under the covenant not to sue, ICOS is free to fully practice *all 615 claims of the covenanted patents*, either separately or in combination with each other.  Under Federal Circuit law, then, ICOS is entitled to an implied license by legal estoppel to any Scanner patent that would derogate from its right to fully practice *every claim* of the covenanted patents.  To the extent Scanner argues – incorrectly – that any limitation or characteristic of the '237 patent is not present in claim 79 as analyzed above, ICOS may show that it is entitled to an implied license by demonstrating that such limitations or characteristics appear in *any claim* of the covenanted patents.

**B.**   **The '237 Patent Is Unenforceable On The Basis Of Prosecution Laches**

    **1.**   **Legal Standard for Prosecution Laches**

Prosecution laches is an equitable doctrine intended to curb abuse of the patent system. The doctrine may be applied to bar enforcement of patent claims where there has been (i) an unreasonable and unexplained delay in prosecution of the patent and (ii) intervening adverse rights have prejudiced the alleged infringer. This two-prong test is based on principles of traditional laches. *See Cancer Research Tech. Ltd. v. Barr Labs., Inc.,* 625 F.3d 724 (Fed. Cir. 2010); *A & E Products Group, L.P. v. Mainetti USA Inc.,* 70 U.S.P.Q.2d 1080, 1082 (S.D.N.Y. 2004) ("plaintiff delayed for an unreasonable and inexcusable length of time, and . . . the delay operated to the prejudice or injury of the defendant"); *Cummins-Allison Corp. v. Glory Ltd.,* WL 355470 at *40 (N.D. Ill. Feb. 12, 2003) ("Under this doctrine, the holder of a valid patent nonetheless may be barred from enforcing it if there was an unreasonable and unexplained delay in prosecuting the patent claim, and the alleged infringer has suffered prejudice as a result."); *Chiron Corp. v. Genentech, Inc.,* 268 F. Supp. 2d 1139, 1141 (E.D. Cal. 2002); *In re Katz Interactive Call Processing Patent Litig.,* 2010 WL 1838641 at *30 (C.D. Cal. May 5, 2010); *Gen-Probe Inc., v. Vysis, Inc.,* 2002 U.S. Dist. LEXIS 25020 at *119 (S.D. Cal. August 5, 2002).

Prosecution laches may be found even if the patent applicant had complied with pertinent statues and the rules of the United States Patent and Trademark Office ("PTO"). *See Symbol Techs., Inc. v. Lemelson Med.,* 277 F.3d 1361, 1366-68 (Fed. Cir. 2002) ("*Symbol II*"); *In re Bogese II,* 303 F.3d 1362, 1367 (Fed. Cir. 2002). Determination of whether prosecution laches applies "is to be decided as a matter of equity, subject to the discretion of a district court before which the issue is raised." *Symbol Techs., Inc. v. Lemelson Med.,* 422 F. 3d 1378, 1385 (Fed. Cir. 2005) ("*Symbol IV*"). The district courts have utilized a variety of factors to assess the

unreasonable and unexplained delay prong of the prosecution laches analysis. *See Reiffin v. Microsoft Corp.*, 270 F. Supp. 2d 1132, 1155 (N.D. Cal. 2003).

In its recent *Cancer Research* opinion, the Federal Circuit clarified that the prejudice prong of a prosecution laches analysis is established by "evidence of intervening rights, i.e., that either the accused infringer or others invested in worked on, or used the claimed technology during the period of delay." *Cancer Research*, 625 F.3d at 729.   When intervening rights are shown from the public sales and use of the accused technology by the defendant and the public, even a delay of only six years by an applicant in presenting claims to the PTO can give rise to prosecution laches. *See Pratt & Whitney Co. v. United States*, 345 F.2d 838, 843 (Ct. Cl. 1965).[4]

## 2.    **Prosecution Laches Bars Enforcement of Scanner's '237 Patent**

This Court should bar the enforcement of the '237 patent pursuant to the equitable doctrine of prosecution laches because Scanner and its counsel unreasonably delayed the prosecution of the patent over the course of twelve years, during which time the semiconductor industry in general, and ICOS in particular, acquired substantial intervening rights due to the widespread public use and sale of BGA inspection technology worldwide.  During this time of unreasonable delay, ICOS invested in the development of the very products that Scanner alleges are infringing the '237 patent.  The uncontested facts, including Scanner's own admissions, establish that Scanner delayed the prosecution of the '237 patent specifically to add new patent claims to the chain of patent applications with the goal of adding claims that would cover the technology ICOS and its customers were developing while the applications in the chain were in prosecution before the PTO for over twelve years.

---

[4] The Federal Circuit has acknowledged the continuing precedential effect of *Pratt & Whitney* with respect to prosecution laches.  *See Symbol Techs., Inc. v. Lemelson Medical*, 277 F.3d 1361, 1366 (Fed. Cir. 2002).

a.   **The Four Patent Applications In The '237 Patent Chain Span 12 Years**

The '237 patent issued on January 26, 2010 from the fourth application in a chain of applications that date from a filing with the PTO over twelve years earlier on January 13, 1998. The four patent applications that led to the issuance of the '237 patent appear in the lower portion of Figure 1 *supra*. Dashed lines connect the continuation and CIP applications in the chain spanning from January, 1998, to January, 2010.

As shown in Figure 1, in January of 1998, Scanner filed U.S. Patent Application No. 09/908,243, entitled *Method and Apparatus for Three Dimensional Inspection of Electronic Components*. Eighteen months later, in July of 1999, Scanner filed Application No. 09/351,892. This second application in the '237 patent chain was a CIP off of the initial application and bore the same title. After another four and a half years of prosecution of this second application in the chain before the PTO – and only a month before this CIP application was to issue – Scanner filed in February of 2005 a third application based on the initial January, 1998, filing. This third application, No. 11/069,758, entitled *Electronic Component Products and Method of Manufacturing Electronic Component Products*, was filed as a continuation of the second application. Then finally, after an additional two years of prosecution before the PTO, Scanner filed in April of 2007 *yet another* CIP application based on the initial filing back in January of 1998. Application No. 11/735,982 – the fourth application in the '237 patent chain – was entitled *Method of Manufacturing Ball Array Devices Using an Inspection Apparatus Having Two or More Cameras and Ball Array Devices Produced According to the Method*. This fourth application in the chain eventually issued as the '237 patent in January of 2010, over twelve years after the initial application in the chain was filed.

**b.   Scanner Delayed Prosecution Of The '237 Patent To Add Claims Covering Products Developed By ICOS And Other Scanner Competitors During Prosecution**

Scanner delayed prosecution of the '237 patent chain in an attempt to draft patent claims to cover new technology that was in development by ICOS and other Scanner competitors, and to capture new developments in how the semiconductor industry operated.  This is a clear instance where ICOS and the market acquired intervening rights from Scanner's unreasonable delay in presenting claims.  Specifically, Scanner took unusual steps to delay the application process and directly changed its prosecution of the applications in the chain to address evolutions in the field that relate to the claimed invention, including new technologies in development by ICOS, to avoid prior art disclosed to ICOS in litigation, and to amend it specifications and claims to cover products electronically inspected overseas under the evolving landscape of the semiconductor industry.

David P. Mork is one of the two named inventors on the '237 patent.  He was deposed in this action on January 5, 2011.  At his deposition, Mr. Mork also produced documents relevant to the prosecution of the application in the '237 patent chain.  Mr. Mork's testimony and documentation he produced at his deposition demonstrate an egregious abuse by Scanner of the patent prosecution system.

**(1)   Scanner Began Its Pattern of Prosecution Delay In 1999**

Scanner's pattern of delay in the prosecution of what would eventually issue as the '237 patent to address developments in the marketplace began in July of 1999, only 18 months after the first application in the chain was filed.  Mr. Mork testified at his deposition that Scanner filed the second application in the chain specifically to attempt to obtain claims that covered products in development by ICOS at the time:

Q.   Okay.  Was there anyone else in the industry that Mr. Beaty or you were monitoring to try and draft claims to cover during this 1999-2000 time frame?

A.   To our -- to my knowledge, the only products on the market that were similar were the UltraVim Plus and the [ICOS's] CyberSTEREO.  And we were not drafting claims to cover any other equipment at that time.

Q.   And were the claims in the 1999 -- the two 1999 -- the two May 1999 applications, were those claims attempts -- were they drafted in an attempt to cover exactly what the CyberSTEREO system purported to be?

A.   Well, there were method claims and apparatus claims, so it -- the -- I would say that the claims were drafted closely to the data brochure of the CyberSTEREO, and as far as the intention, I believe that Mr. Beaty also had the intent to cover that method of inspecting a BGA.

Q.   And when was the CyberSTEREO first released, to the best of your knowledge?

A.   I believe it was in April of 1999.  I recall some sort of press release by ICOS.  I'm not sure when the first unit actually shipped.

Mork Tr. 65:13-66:12.

Then, just weeks later in July of 1999, Scanner filed a CIP application to cover a single-camera ball grid array inspection system because, on the eve of an industry trade show, Scanner heard a rumor that ICOS was developing such a system.  Mr. Mork testified as follows.

Q.   And what were the features added in that July 13th, 1999 application?

A.   I believe there was some text and drawings to support a single-camera system.

Q.   Why was that added?

A.   In July of 1999, again, Scanner Technologies was preparing for a trade show in California.  And while we were preparing for the trade show, July 12th or 11th, perhaps, it was before the show, Mr. Beaty heard a rumor of a single-camera system, and he wanted to file claims to cover that system before he could be accused of seeing it at the trade show.

Mork Tr. 67:7-19.

Q.   Okay.  Now, you had said, with respect to this July 13, 1999, that there was kind of a rush to get these -- this new matter on file prior to a trade show; did I have that right?

A.   That's my recollection, yes.

Q.   And I think you said that the reason why was that Mr. Beaty didn't want to be accused of having learned of it at the trade show?

A.   That was my recollection, yes.

Mork Tr. 72:4-12.

Q.   Was part of his objective to be able to get something on file that he could, again, draft claims to try and cover what ICOS was doing?

A.   I believe there was, yes, to speculate as to what ICOS might have in a single-camera system and have protection for that, if possible.

Mork Tr. 72:21-73:1.

Scanner's prosecution of Application No. 09/351,892 continued for nearly six years before it eventually issued in March of 2005.  Testimony provided in this litigation by Mr. Mork and by one of the attorneys prosecuting the patent applications for Scanner in this litigation, demonstrate that Scanner's strategy was to continually amend the specifications and claims of new applications to reach products for sale in the market.  Scanner sought to avoid prior art disclosed to it during litigation and obtain patent claims that would cover products manufactured by a particular process overseas.  Scanner baldly admits to pursuing both of these strategies.

When questioned about novel material that was claimed in the '237 patent, Mr. Mork testified that Scanner had amended to avoid prior art produced by ICOS in other litigation:

A.   I mean, we did some analysis as we were drafting claims, but it was more reflective of what was going on at the time.  And I can give you an example in this '237 patent, we were concerned about the prior art that ICOS produced that we referred to as Kratzer reference, which was a PCT application, I believe.  And, specifically, we wanted to make sure that we had claims that limited the calibration fixture or the calibration pattern to a fixed position.

Mork Tr. 110:16-23.  *See also* Gupta Decl. Exh. Y.

-31-

Mork further testified that his co-inventor Mr. Beaty had specifically sought to patent products produced by a particular process to reach the manufacture of devices overseas. Mork. Tr. 82:16-19; 83:2-21.

The use of the PTO's continuation application procedures to amend claims to avoid prior art disclosed in litigation is as an abuse of the patent prosecution system. *See* Mark A. Lemley & Kimberly A. Moore, *Ending Abuse of Patent Continuations*, B.U. L. Rev. 84:63-118 (2004).

### (2)   Scanner Continued Its Pattern of Abusive Prosecution Delay In 2007

When Scanner learned in February of 2007 that the PTO had issued a Notice of Allowance of claims in Scanner's third application in the chain (Appl. No. 11/069,758), Scanner once again delayed prosecution. Scanner filed the fourth application in the chain (Appl. No. 11/735,982) on April 16, 2007, so that it would be on file prior to the issuance of claims on the third application. Gupta Decl. Exh. Q. Then, on the next day, April 17, 2007, Scanner filed a Request for Continued Examination in which Scanner replaced all prior versions of the claims in the third application. Gupta Decl. Exh. R.

Documents Mr. Mork produced at his deposition establish that Scanner delayed the issuance of the claims in the third patent application so that it could get new claims on file in the fourth application which Scanner hoped would address technology being introduced in the marketplace by Scanner's competitors NVIDIA and Tessera.

On April 9, 2007, a week prior to the filing of the fourth application, Elwin Beaty of Scanner sent an e-mail to Mr. Mork and Kevin Pontius (Scanner's prosecution counsel at the firm of Roberts and Mardula) stating that "Since we have served Nvidia with our first request for production of documents, we need to file our applications ASAP. Please make sure that Claim one on the old and new applications is the broadest claim." Scanner was embroiled in patent

infringement litigation against NVIDIA in the Eastern District of Texas in April of 2007 when this e-mail was sent. Gupta Decl. Exh. S.

In an e-mail from Mr. Beaty to Mr. Mork and Kevin Pontius the same day the fourth application was filed, Mr. Beaty states that he has added claim terms to read directly on characteristics announced by Tessera in a press release. Gupta Decl. Exh T.

Another document produced by Mr. Mork at his deposition confirms that in the month prior to the PTO's Notice of Allowance of claims in the third application Scanner was working with its patent prosecution counsel to draft new claims covering inspection methods for ball grid array devices. *See* Gupta Decl. Exh. U.

Scanner's strategy of seeking to add new claims addressed to competitive developments in the marketplace is underscored by the fact that Mr. Mork testified that he was not aware that the fourth application was filed as a CIP application, that he did not know that new subject matter had been added to the application and that, as a consequence, he did not even consider whether he had a duty to disclose prior art relevant to the new subject matter added in the fourth patent application in the chain. Mork Tr. 40:2-12; 41:10-19; 43:9-44:13.

Mr. Mork admitted that he did not consider whether prior art needed to be disclosed to the PTO as a consequence of the addition of new subject matter to the fourth patent application. His testimony concerned a the Declaration he submitted to the PTO with the fourth application. Mork Tr. 48:8-18; 49:11-50:8; 51:4-52:13. The declaration was Exhibit 7 to the Mork deposition and is annexed to the Gupta Decl. as Exh. Z. Finally, Mr. Mork also testified that Scanner's goal in the fourth application was to obtain claims that would retain the priority date of the application filed in January of 1998. Mork Tr. 112:22-113:12.

These e-mails and deposition admissions provide the context for the actions Scanner took

-33-

upon receipt of the PTO's Notice of Allowance of claims in the third application in February of 2007. Scanner urgently sought to get new claims covering developments in the marketplace on file before the claims in the third application issued and did so with the transparent goal of securing as the priority date for the new claims the date of the filing of the first application on January 16, 1998. Hence, Scanner filed its fourth application with claims addressed to ball grid array inspection devices on April 16, 2007, then filed its Request for Continued Examination of the third application the next day, but it did so without attention to its obligation to disclose prior art material to the new subject matter that it added to the fourth application.

By its actions, Scanner delayed the issuance of claims on the third patent application in the chain, which would have prevented Scanner from again adding claims addressed to competitive developments in the marketplace in the fourth application. By these PTO filings in April of 2007, Scanner unreasonably delayed yet again the prosecution of the inspection device claims that would eventually issue another two and a half years later in the '237 patent.

### (3)    ICOS And The Semiconductor Industry Were Prejudiced By Scanner's Abusive Delays

During the twelve years that Scanner abusively delayed the prosecution of the applications in the '237 patent chain, the semiconductor industry in general, and ICOS in particular, developed intervening rights continuously throughout the period. The period from 1999 through 2010 has been an active one for the technology and product development in the electronics packaging industry. van Gils Decl. ¶ 3; Wiles Decl. ¶¶ 4-6,10. During that time, ICOS has made significant investments in developing, building, marketing, and selling its lines of ball grid array inspection products to customers worldwide. van Gils Decl. ¶ 3. Since 1999, ICOS has enjoyed significant success in the market and steadily positive sales growth as more companies have adopted the use of ICOS's ball grid array inspection technology. *Id.* ¶ 15.

In 1999, ICOS introduced the CyberStereo Module, a two-camera module which allows customers to inspect ball grid arrays from two angles and determine whether the balls lie in a single plane. *Id.* ¶ 4. And in 2003, ICOS began developing a new ball grid array inspection system using three cameras. *Id.* ¶ 7. ICOS introduced its three-camera system at the SEMICON Taiwan conference in September of 2005. *Id.* ¶ 9. Meanwhile, Scanner delayed prosecution of claims in pending applications in an attempt to capture these developments.

Even in 2006 and 2007, ICOS continued to innovate by further developing its ball grid array inspection products, offering customers an allowed for the measurement of the height of the component package. *Id.* ¶ 12. In 2008, ICOS innovated by producing new sensors and illumination for its inspection products. *Id.* ¶ 13. Likewise, the semiconductor industry in general throughout the period from 1999-2010 continued to evolve as ICOS BGA inspection devices gained wide-spread popularity for use in the of testing of BGA semiconductor chips. *See generally* Wiles Decl. ¶¶ 3-10. In sum, while Scanner was delaying the prosecution of the '237 patent chain, the semiconductor industry made widespread use of ICOS inspection systems, precisely because the industry had no notice that ICOS would eventually claim patent rights to such technology. *Id.* ¶¶ 8-10. Thus, this is a quintessential example of ICOS and the market acquiring intervening rights due to Scanner's unreasonable delays in prosecution. *See Pratt & Whitney* 345 F.2d at 843 (six-year delay presenting claims to the PTO, during which the defendant's accused devices had been in public use and on sale, gave rise to intervening rights sufficient to support prosecution laches).

## V.      CONCLUSION

For the reasons stated above, ICOS respectfully requests that this Court grant ICOS's motion for summary judgment in its favor on ICOS's affirmative defense of implied license by legal estoppel and its affirmative defense of prosecution laches.

Dated: New York, New York
   April 15, 2011

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By: _____
  Paul R. Gupta
  Clifford R. Michel
  51 West 52nd Street
  New York, New York  10019
  Tel: 212-506-5000
  Fax: 212-506-5151

  I. Neel Chatterjee  (Admitted Pro Hac Vice)
  Monte M.F. Cooper (Admitted Pro Hac Vice)
  1000 Marsh Road
  Menlo Park, California  94025
  Tel: 650-614-7400
  Fax: 650-614-7401

  Attorneys for Plaintiffs
  ICOS Vision Systems Corporation N.V. and
  ICOS Visions Systems Inc.