UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
ICOS VISION SYSTEMS CORPORATION N.V. :
and ICOS VISIONS SYSTEMS INC.,       :
                                     :
                 Plaintiffs and      :
                 Counterclaim        :
                 Defendants,         :
                                     :
        - against -                  :
                                     :
SCANNER TECHNOLOGIES CORPORATION,    :
                                     :
                 Defendant and       :
                 Counterclaimant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 15, 2012

10 Civ. 0604 (PAC)

<u>OPINION & ORDER</u>

HONORABLE PAUL A. CROTTY, United States District Judge:

The parties in this action have been involved in patent litigation for over ten years. This action concerns U.S. Patent No. 7,653,237 (the "'237 Patent"). Plaintiffs/Counterclaim defendants ICOS Vision Systems Corp. N.V. and ICOS Visions Systems Inc. (collectively, "ICOS") filed this action on January 26, 2010 seeking a declaratory judgment of non-infringement and invalidity of the '237 Patent. On July 14, 2010, Defendant/Counterclaimant Scanner Technologies Corporation filed an answer and counterclaim against ICOS for infringement of the '237 Patent. The Court issued a bifurcation order, amended on March 4, 2011, which bifurcated the issues of liability and damages and allowed ICOS to file a single summary judgment motion with respect to two issues: (1) whether ICOS is entitled to enjoy an implied license via legal estoppel to the '237 Patent, and (2) whether the '237 Patent is unenforceable due to "prosecution laches." (Docket No. 30.) ICOS now moves for summary judgment on their affirmative defenses of implied license by legal estoppel and prosecution laches. For the reasons discussed below, ICOS's motion for summary judgment with respect to

1

an implied license to the '237 Patent by way of legal estoppel is granted; and ICOS's motion concerning prosecution laches in connection with the '237 Patent is denied.

## BACKGROUND[1]

The patents at issue in this case concern the technology used to inspect electronics packaging. In order to protect their delicate electronics, microchips require specialized packaging. (Declaration of Larry Thompson in Support of ICOS's Motion for Summary Judgment, ("Thompson Decl."), ¶ 25.) This packaging serves four functions: (1) connect the microchip to a power source; (2) provide a means for distributing electronic signals on and off the microchip; (3) remove heat generated by the circuit; and (4) support and protect the chip from the environment. (Id. ¶¶ 25-26.)

"Ball grid arrays" provide a method of securing the electrical connections between the microchip and circuit board. The ball grid array consists of a series of solder balls arranged in a grid. These grid arrays must be precisely aligned; small deviations in the height or positioning of a single ball can render the entire ball grid array defective. (Id. ¶ 25.) Each ball grid array is inspected during the manufacturing process to ensure that these specifications are met. (Id.)

### A.     The '237 Patent

Scanner is the record owner of the '237 Patent, entitled "Method of Manufacturing Ball Array Devices Using an Inspection Apparatus Having One or More Cameras And Ball Array Devices Produced According to the Method," issued January 26, 2010. (Pl's 56.1 ¶ 1.) The patent relates to a method of calibrating and inspecting ball grid arrays.

---

[1] Facts are taken from Plaintiffs' Rule 56.1 Statement ("Pl's 56.1") except where otherwise indicated.

The machine covered by the '237 Patent inspects ball grid arrays by using two cameras, optics, and a computer processor. The machine is first calibrated by taking bottom and side view images of a "calibration reticle," which contains a known pattern (referred to in the '237 Patent as a "planar precision pattern"). (Id. ¶ 34.) The machine then captures multiple images of each ball grid array, and a computer calculates the coordinates of each ball on the grid. (Id. ¶¶ 35-37.) Ball grid arrays that pass certain manufacturing specifications are cleared; those that fail are either discarded or repaired. (Id. ¶ 38.)

The '237 Patent is the last in a family of thirteen patents issued to Scanner concerning ball grid array inspection devices. Scanner filed the first patent application in this family two decades ago, Application No. 07/703,285, on May 20, 1991.[2] (Pl's 56.1 ¶ 21.) ICOS argues that after Scanner filed the third of these patent applications, Application No. 09/908,243, in January of 1998, Scanner began to engage in "gamesmanship" with the Patent and Trademark Office (the "PTO") which unreasonably delayed prosecution of the '237 Patent. (Pl's Mem. at 10.)

1. Prosecution of the '237 Patent Family

ICOS argues that beginning in May 1999 and extending to April 2007, Scanner filed with the PTO a series of divisional, continuation, and continuation-in-part applications from the 09/908,243 application.[3] (The final application in this chain, Application No. 11/735,982, issued as the '237 Patent in January, 2010.) ICOS contends that Scanner used these subsequent applications, and unreasonably delayed prosecution of the '237 Patent in order to add new patent claims to the family. According to ICOS, these claims covered technology that ICOS and its

---

[2] The remaining patent applications and corresponding dates on which patents in this family were issued are listed in Plaintiff's 56.1 Statement at ¶¶ 23-42.
[3] Plaintiffs include a diagram of the four patent applications leading to the '237 Patent in their brief. (See Pl's Mem., Fig. 1, at 10.)

customers were developing and using during the twelve years that Scanner's '237 Patent application was in prosecution before the PTO. (Pl's Mem. at 27.) For example, David P. Mork, one of the two named inventors on the '237 Patent, testified at his deposition that the three patent applications Scanner filed between May and July 1999 were drafted to cover inspection technology that was either in use or in development by ICOS.

> Q. Okay. Was there anyone else in the industry that . . . you were monitoring to try and draft claims to cover during this 1999-2000 time frame?
>
> A. To our – to my knowledge, the only products on the market that were similar were the UltraVim Plus and [ICOS's] CyberSTEREO. And we were not drafting claims to cover any other equipment at that time.
>
> Q. And where the . . . two May 1999 applications, were those claims attempts – were they drafted in an attempt to cover exactly what the CyberSTEREO system purported to be?
>
> A. Well, there were method claims and apparatus claims, so it – the – I would say that the claims were drafted closely to the data brochure of the CyberSTEREO, and as far as the intention, I believe that Mr. Beaty [referring to Elwin Beaty, the second named inventor of the '237 Patent] also had the intent to cover that method of inspecting a [ball grid array].
>
> Q. And when was the CyberSTEREO first released, to the best of your knowledge?
>
> A. I believe it was in April of 1999. I recall some sort of press release by ICOS.

(Gupta Decl., Ex. P, at 65:13-66:12.) Mork further testified that on July 13, 1999, Scanner filed Application No. 09/351,892, the second application in the '237 Patent chain, as a continuation-in-part of Application No. 09/908,243 to cover a single-camera ball grid array inspection system being developed by ICOS. When asked why this claim was added, Mork testified: "In July of 1999, again, Scanner [ ] was preparing for a trade show in California. And while we were preparing for the trade show, . . . Mr. Beaty heard a rumor of a single-camera system, and he wanted to file claims to cover that system before he could be accused of seeing it at the trade

4

show. . . . [T]he rumor was that ICOS would display it." (Id. at 67:12-23.) Application No. 09/351,892 issued in March 2005. ICOS argues that Scanner thus filed Application No. 09/351,892 "in an attempt to obtain claims that covered products in development by ICOS at the time." (Pl's 56.1 ¶ 43.)

In February 2005, Scanner filed the third application in the '237 chain, Application No. 11/069/758, as a continuation patent of Application No. 09/351,892. (Pl's Mem. at 12.) On April 16, 2007, the PTO issued Scanner a Notice of Allowance of claims on Application No. 11/069,758. The next day, Scanner filed a Request for Continued Examination in which Scanner replaced all prior versions of the claims in Application No. 11/069,758. (Pl's 56.1 ¶ 41.) ICOS alleges that Scanner delayed issuance of claims in that application in order to place new claims on file in Application No. 11/735,982, a continuation-in-part application which Scanner filed on April 16, 2007. (Id. ¶¶ 41, 45.) This last application subsequently issued as the '237 Patent in January 2010.

Scanner maintains that it "did not engage in any delays that unjustifiably delayed prosecution of the '237 patent application," and that it "regularly filed motions to expedite its patent applications by paying additional fees." (Def's Rule 56.1 ¶¶ A-5, A-6.) According to Scanner, the claims filed in Application No. 09/908,243 in 1998 "were poorly drafted and defective, did not adequately claim the disclosed invention and were too narrow to cover what the inventors intended they should cover." (Id. ¶ A-8.) Scanner argues that the '237 Patent claims reflect efforts to correct those errors, and that the PTO implicitly condoned Scanner's procedure by granting the '237 Patent. (Id. ¶ A-10.) As a result, Scanner does not controvert the

majority of the facts set forth in ICOS's 56.1 Statement listing the history of applications filed in the '237 Patent chain.

      B.      Prior Litigation and the Covenant Not to Sue

In July 2000, Scanner filed an action against ICOS for patent infringement in this district. (Pl's 56.1 ¶ 61 (citing Scanner Techs. Corp. v. ICOS Vision Sys. Corp., N.V., No. 00 Civ. 4992 (S.D.N.Y.).) That case was tried before Judge Chin, who found that ICOS's product did not infringe upon Scanner's patents and that the patents were unenforceable. Scanner Techs. Corp. v. ICOS Vision Sys. Corp., N.V., 486 F. Supp. 2d 330, 343, 347 (S.D.N.Y. 2007) *aff'd in part, vacated in part, rev'd in part*, 528 F.3d 1365 (Fed. Cir. 2008). The Federal Circuit affirmed Judge Chin's invalidity and non-infringement rulings, but reversed his unenforceability ruling as clearly erroneous. See 528 F.3d 1365. In response to the Federal Circuit's decision and ICOS's fear that it would be sued on Scanner's remaining patents, on September 19, 2008, ICOS filed a declaratory judgment action in this district against Scanner alleging the invalidity and non-infringement of eight patents. See ICOS Vision Sys. Corp., N.V. v. Scanner Techs. Corp., No. 08 Civ. 8142 (S.D.N.Y.) (Chin, J.) ("the 2008 Action"). (See Declaration of Kevin McAndrews ("McAndrews Decl.") ¶ 12.)

The parties subsequently engaged in settlement negotiations, and on March 11, 2009, Scanner sent ICOS a "Covenant Not To Sue" (the "CNS") on the eight patents at issue in the September 2008 declaratory judgment action. (Pl's 56.1 ¶¶ 75, 78, 79) These include U.S. Patent Nos. 7,079,678 (the "'678 Patent"); 7,086,411 (the "'411 Patent"); 6,915,006 (the "'006 Patent"); 6,915,007 (the "'007 Patent"); 6,862,365 (the "'365 Patent"); 6,072,898 (the "'898 Patent"); 5,574,668 (the "'668 Patent"); and 5,173,796 (the "'796 Patent") (collectively the

"CNS Patents"). (Pl's 56.1 ¶ 5; McAndrews Decl. ¶¶ 17-18.) The CNS provided that Scanner would not sue ICOS "for infringement, whether direct or indirect, of any claim of [the CNS Patents] based upon methods or products previously or currently made, used, offered for sale, or sold in the United States or imported into the United States by [ICOS] prior to the date of [the CNS]."[4] (Id.) On July 30, 2009, during a conference with the court, counsel for Scanner confirmed to the court and to ICOS "that the products or processes that existed at the time of the [sic] Scanner's covenants not to sue are immune from suit by Scanner, both now and in the future, and that the covenants not to sue exhaust Scanner's patent rights against any customers of ICOS or NVIDIA[5] for the [CNS Patents]." (Pl's 56.1 ¶ 8.) Since receiving the CNS, ICOS has continued to develop new products and expand its sales worldwide. (Pl's 56.1 ¶¶ 81, 83.)

On August 28, 2009, Scanner moved to dismiss the 2008 Action and other related cases,[6] arguing in part that the CNS deprived the court of subject matter jurisdiction under the Declaratory Judgment Act. On March 29, 2010, Judge Chin denied Scanner's motion to dismiss and determined that the CNS did not deprive the court of declaratory judgment jurisdiction. ICOS Vision Sys. Corp., N.V., v. Scanner Techs. Corp., 699 F. Supp. 2d 664, 670 (S.D.N.Y. 2010).

On January 20, 2011, counsel for Scanner emailed counsel for ICOS stating that Scanner was revoking the CNS.[7] (Pl's 56.1 ¶ 12.) Counsel explained that Scanner viewed the CNS as a

---

[4] The CNS was executed on March 10, 2009. (See Declaration of Kevin McAndrews, Ex. D.)
[5] NVIDIA Corporation is a customer of ICOS. (Pl's 56.1 ¶ 64.)
[6] These actions, along with the instant case, were reassigned to this Court on May 12, 2010. (Docket No. 11.)
[7] Counsel's email states in part: "[W]e hope to fully resolved [sic] matters relating to the entire Scanner patent portfolio, and that the only patent in play at the moment is the '237 patent. Nevertheless if we are unable to achieve a satisfactory resolution, Scanner is reserving all its rights permitted by law on the entire portfolio. To that effect, Scanner has revoked the CNS agreements previously executed as per the attached revocations." The January 20, 2011 email and revocation document are attached as Exhibit L to the Declaration of Paul Gupta ("Gupta Decl.").

revocable license, and that "[s]ince Scanner was unable to defeat ICOS and NVIDIA's claim of jurisdiction [in the declaratory judgment actions before Judge Chin], there is no benefit to Scanner to continue the license and thus [Scanner] has revoked them."  (Gupta Decl. Ex. L.)

## **DISCUSSION**

    A.    Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir.2003) (internal citations and quotations omitted), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts.  Fed. R. Civ. P. 56(e).  The court resolves all ambiguities and draws all factual inferences

in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id.

>B.	Implied License by Legal Estoppel

ICOS argues that Scanner's assertion of its rights under the '237 Patent would derogate ICOS's rights to practice the CNS Patents, and that ICOS is therefore entitled to an implied license by legal estoppel to practice the '237 Patent. Scanner contends that because ICOS paid no consideration for the CNS, it is not entitled to any implied license. ICOS submits that consideration is not a required element under the implied license doctrine.

"In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571, 1581 (Fed. Cir. 1997). As its name suggests,

> [n]o formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort.

Id. at 1580 (quoting DeForest Radio Tel. Co. v. United States, 273 U.S. 236, 241 (1927)). An implied license arises by acquiescence, by conduct, by equitable estoppel, or by legal estoppel. Id. These labels denote different categories of conduct, each of which leads to an implied license. See id.

"Legal estoppel refers to a narrow [ ] category of conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted." TransCore, LP v. Elect.Transaction Consultants Corp., 563 F.3d 1271, 1279 (Fed. Cir. 2009) (quoting Wang Labs., Inc., 103 F.3d at 1581). A covenant not to sue effectively operates as a license. See id. at 1275 ("[A] non-exclusive patent license is equivalent to a covenant not to sue . . . .") (citing cases). The Federal Circuit has made clear that consideration is necessary before legal estoppel can arise. See Gen. Protecht Group, Inc. v. Leviton Mfg. Co., Inc., 651 F.3d 1355, 1361 (Fed. Cir. 2011) ("TransCore prohibits a patent licensor from derogating from rights granted under the license by taking back in any extent that for which [it] has already received consideration") (internal quotation omitted); Minnesota Min. & Mfg. Co. v. E. I. du Pont de Nemours & Co., 448 F.2d 54, 57 (Fed. Cir. 1971) ("The essence of [implied license by] legal estoppel . . . involves the fact that the licensor . . . has licensed . . . a definable property right for valuable consideration, and then has attempted to derogate or detract from that right." (quoting AMP Inc. v. United States, 389 F.2d 448, 452 (Ct. Cl. 1968)); see also Sun Microsystems, Inc. v. Versata Entrs., Inc., 630 F. Supp. 2d 395, 411 (D. Del. 2009) (stating that "an essential element of an implied license by conduct or one by legal estoppel is that the plaintiff receive consideration from the defendant in exchange for the granting of the right" and striking implied license defense where defendant did not allege facts suggesting that plaintiff received consideration in exchange for use of the patent).[8]

---

[8] ICOS argues that DeForest holds that a gratuitous license can be the basis for an implied license. (Pl.'s Reply at 3 (citing DeForest, 273 U.S. at 241).) Although the Federal Circuit has applied DeForest in the implied license by equitable estoppel context, it has not done so where the asserted implied license arises by legal estoppel. See Wang Labs., 103 F.3d at 1580 ("The opinions that hew most closely to the DeForest language and the 'entire course of conduct' analysis rely on the doctrine of equitable estoppel, because DeForest requires that conduct of the patentee led the other to act.").

Scanner argues that because the CNS is not supported by consideration, no implied license by legal estoppel can follow. Lack of consideration is not fatal here, however. As the doctrine of implied license by legal estoppel stems from contract principles, promissory estoppel may serve as a substitute for consideration. See Middle East Banking Co. v. State Street Bank Intl., 821 F.2d 897, 907 (2d Cir. 1987) ("Reliance is a necessary element of promissory estoppel, which, in certain contexts, may serve as a substitute for consideration.") (citation omitted). A party asserting promissory estoppel must prove: "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance." Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).

There is no consideration for the CNS given here; but ICOS and its customers relied on Scanner's promise not to sue for infringement of the eight CNS Patents under the terms set forth in that agreement. After ICOS was acquired by KLA-Tencor in May 2008, Kevin McAndrews, Vice President and Associate General Counsel of KLA-Tencor, negotiated the CNS with Scanner's CEO, Paul Crawford. (McAndrews Decl. ¶¶ 2, 17-18.) McAndrews states that "[s]ince receiving the [CNS], ICOS has relied on the [CNS] as giving it freedom to operate without fear of further claims related to these patents with respect to certain products and designs." (Id. ¶ 19.) In reliance on the CNS, ICOS has expand its sales worldwide and has indemnified its customers against future suit. (Id.) NVIDIA, in turn, has relied on the CNS for assurance that as ICOS's customer, it is entitled to continue using ICOS's ball grid array inspection devices that existed as of March 10, 2009 without risk that Scanner will bring suit against NVIDIA for infringement of the CNS Patents. (Declaration of David Shannon ¶ 5.) Scanner presents no facts that show a genuine issue of material fact as to whether ICOS and its

11

customers relied on the CNS.[9]  Accordingly, ICOS has demonstrated promissory estoppel and satisfies the element of consideration for the CNS.  ICOS has therefore established that the CNS constitutes a valid license.  As discussed below, this license forms the predicate for an implied license by legal estoppel.

The record further shows that Scanner has derogated ICOS's rights under the CNS by accusing ICOS of infringing the '237 Patent.  The reasoning of TransCore controls here.  In that case, TransCore entered into a settlement agreement with Mark IV, in which TransCore covenanted not to sue under multiple patents covering automated toll collection technology.  563 F.3d at 1273.  The agreement provided that TransCore:

> covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement of any of [10 listed patents] . . . for the entire remainder of the terms of the respective United States Patents . . . .  This Covenant Not to Sue shall not apply to any other patents issued as of the effective date of this Agreement or to be issued in the future.
>
> . . .
>
> [Transcore] fully and forever release[s], discharge[s] and dismiss[es] all claims, demands, actions, causes of action, liens and rights, in law or in equity (known, unknown, contingent, accrued, inchoate or otherwise), existing as of June 26, 2001, that [it has] against MARK IV ... but excluding any claims for breach of this Agreement. No express or implied license or future release whatsoever is granted to MARK IV or to any third party by this Release.

Id.  Transcore subsequently sued Electronic Transaction Consultants Corp. ("ETC"), a third party who won a bid to install and test automated toll equipment purchased from Mark IV, for infringement of three of the 10 patents covered by the settlement agreement, along with a continuation patent that had not yet issued at the time of settlement.  See id.

---

[9] To the extent that Scanner argues that ICOS's actions do not constitute reliance as a matter of law because ICOS did not change its conduct after receiving the CNS, (Def's Mem. at 13-14), this argument is unsupported.

at 1273-74.  The court found that under the settlement agreement with Mark IV, TransCore had exhausted its patent rights in the previously asserted patents and that the settlement agreement gave rise to an implied license to practice the continuation patent "by virtue of legal estoppel."  Id. at 1274, 1278.  TransCore had not disputed that the continuation patent "was broader than, and necessary to practice," at least one of the patents covered by the settlement agreement.  Id. at 1279.  The court found that "in order for Mark IV to obtain the benefit of its bargain with TransCore, it must be permitted to practice [the continuation patent] to the same extent it may practice" the remaining patents covered by the settlement agreement.  Id.  Mark IV was therefore "an implied licensee" of the continuation patent, and its rights to practice that patent were "necessarily coextensive with the rights it received" through the settlement agreement.  Id. at 1279-80.

Here, the record shows that Scanner's assertion of the '237 Patent against ICOS would derogate ICOS's rights to practice claims in the CNS Patents.  ICOS presents expert analysis to show how the alleged inventions claimed in the '237 Patent are broader than those contained in the CNS Patents.  (See Thompson Decl. ¶¶ 28-65.)  Scanner presents no evidence to controvert this analysis.

The Court need not engage in a detailed analysis of the respective patent claims, however, because the '237 Patent is a continuation of other patents covered by the CNS.  In Gen. Protecht Group, the parties' settlement agreement contained a covenant not to sue for infringement of two patents.  651 F.3d at 1357.  The defendant subsequently sued for infringement of continuation patents based on those contained in the settlement agreement, and plaintiff filed a declaratory judgment action for non-infringement.  Id. at

1358. The Federal Circuit, following TransCore, found that the covenant not to sue entitled General Protecht to an implied license. The court observed that "the newly asserted continuations are based on the same disclosure as the previously licensed patents and that, by definition, the continuations can claim no new invention not already supported in the earlier patents." Id. at 1361. In addition, the suit involved "the same products" as those accused in the parties' earlier settled action. Id. The court extended TransCore and held that "it reasonably follows that where, as here, continuations issue from parent patents that previously have been licensed as to certain products, it may be presumed that, absent a clear indication of mutual intent to the contrary, those products are impliedly licensed under the continuations as well." Id. The same result applies here, where the CNS does not expressly exclude subsequent patents in the chain. Accordingly, ICOS has an implied license to practice the '237 Patent.

    C.    Prosecution Laches

ICOS argues that Scanner unreasonably delayed in prosecuting the '237 Patent in order to expand the scope of its claims to include products developed by ICOS. (Pl's Mem. at 2-3.) ICOS contends that the equitable doctrine of prosecution laches renders Scanner's '237 Patent unenforceable. Scanner argues that the record fails to show how any delay was unreasonable and that the '237 Patent enjoys a statutory presumption of validity. (Def's Mem. at 5.)

Prosecution laches is an equitable defense to patent infringement. "The doctrine 'may render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution' that constitutes an egregious misuse of the statutory patent system under the totality of the circumstances." Cancer Research Tech. Ltd. v. Barr Labs., Inc., 625 F.3d 724,

728 (Fed. Cir. 2010) (quoting Symbol Techs., Inc. v. Lemelson Medical, 422 F.3d 1378, 1385-86 (Fed. Cir. 2005) ("Symbol IV").  Reasonableness is a fact-intensive inquiry "and must include consideration of the circumstances of the [patentee] as patent prosecutor." Reiffin v. Microsoft Corp., 270 F. Supp. 2d 1132, 1155 (N.D. Cal. 2003).[10]  The requirement of unreasonable and unexplained delay "includes a finding of prejudice, as does any laches defense." Cancer Research Tech. Ltd., 625 F.3d at 729.  To establish prejudice, "an accused infringer must show evidence of intervening rights, i.e., that either the accused infringer or others invested in, worked on, or used the claimed technology during the period of delay." Id.

ICOS contends that Scanner delayed the issuance of the claims in Application No. 11/069/758 "so that it could get new claims on file in Application No. 11/735,982, as Scanner had learned that . . . Scanner hoped [sic] would address technology being introduced in the marketplace by Scanner's competitors NVIDIA and Tessera." (Pl's 56.1 ¶ 45.)  These facts, without more, do not constitute inequitable conduct.  See Holmes Group, Inc. v. RPS Prods., Inc., No. 03-40146, 2010 WL 7867756, at *9 (D. Mass. June 25, 2010) (stating that "in patent infringement cases involving continuation applications, it will often be the case that the continuation patent was filed *after* the allegedly infringing device had been on the market for

---

[10] The court in Reiffin outlined seven relevant considerations in assessing the reasonableness of any delay in patent prosecution.  These factors include whether:

> (1) the prosecution history of plaintiff's patents was typical of patents in that field or patents generally; (2) any unexplained gaps exist in the prosecution history; (3) plaintiff took any unusual steps to speed or delay the application process; (4) the PTO or other reviewing body took any unusual steps to speed or delay the application process; (5) plaintiff took any steps to limit public awareness of his pending applications or the inventions he sought to patent over the course of the prosecution; (6) any changes in plaintiff's prosecution of the application coincide with or directly follow evolutions in the field that relate to the claimed invention; and (7) legitimate grounds can be identified for the abandonment of prior applications.

270 F. Supp. 2d at 1155.

some time." (citing Kingsdown Med. Consultants v. Hollister, 863 F.2d 867, 874 (Fed. Cir. 1988)). Scanner asserts that ICOS fails to show any other facts relating to any unexplained or unreasonable delay by Scanner, and that to the extent ICOS relies on the various claims and amendments filed by Scanner, those actions are consistent with federal law and were in good faith. (Def's Mem. at 6-7.) Although some courts have decided prosecution laches defenses on summary judgment, see Reiffin, 270 F. Supp. 2d at 1152 (citing cases), the record in this case is not conducive to resolving this issue at this stage. There are outstanding fact issues with regard to Scanner's reasonableness in prosecuting its patent applications before the PTO. Accordingly, ICOS's motion for summary judgment on its defense of prosecution laches is denied.

## CONCLUSION

For the foregoing reasons, ICOS's motion for summary judgment on the issue of implied licence by legal estoppel is granted. The Court denies ICOS's motion for summary judgment on the issue of prosecution laches. As ICOS has an implied license to practice the claims of the '237 patent, Scanner's counterclaim against ICOS for infringement of the '237 Patent is dismissed. Counts One and Three of ICOS's declaratory judgment complaint are dismissed as moot. The clerk is directed to enter judgment consistent with this order.

Dated: New York, New York
February 15, 2012

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge